Case No. 15-1023 at L. United States Telecom Association Petitioner v. Federal Communications Commission at L. Mr. Keisler for the Petitioners, Mr. Sallet for Respondents, and Mr. Rosa for Respondent Intervenors. Good morning, Your Honors, and may it please the Court. Good morning. The principal issue in this case is whether the FCC has the discretion it claims to relegate Internet service providers to common carrier status, and whether in doing so it acted lawfully under the Communications Act and the APA, an action that required it to take multiple legal and factual conclusions that it had previously and separately reached and reverse them all at once. The central basis for the FCC's action here is its contention that Internet access has become a telecommunications service because customers today principally use it to visit third-party websites and obtain information from those websites. And that, the Commission says, is just telecommunications. And our principal point here is that even if we think of Internet access as exclusively about visiting third-party websites to retrieve information from them, that capability alone is a core information service that Congress protected from common carrier status. Because in 1996, Congress wasn't looking at Internet access the way the Commission is today. Congress believed that the best way to encourage investment and innovation in what it saw as a dynamic and extremely important technology was to give such services separate, protected, regulatory status, walled off from common carriage to distinguish between them. You know, if I were to quote a quote from Fletcher Perry, don't you have to begin with Band X? Doesn't Band X, doesn't the Commission have the choice or the discretion to define it as either information service or telecommunications service? Doesn't that have to be our starting point? Well, I'd be happy to start with that, Your Honor, because I don't think Band X is properly read that way. The central dispute in Band X and the ambiguity that the Supreme Court identified there was whether Internet access service was, on the one hand, only an information service, which the majority thought was reasonable, or, on the other hand, both an information service and a severable telecommunications service packaged together, which is what the dissent thought it had to be. None of the justices so much as suggested that there wasn't an information service in what the ISP was doing. Hasn't the Commission defined it in their own review as both telecommunications and information, and they've classified the telecommunications part of it as common carriage, as Title II? That's what they say they've done.  Right, but that's not what they've actually done, Your Honor. No, because what they mean by that is that other applications like e-mail, for example, they are not included in part of the service. They are separate information services. And while we disagree with that, that's not the principal point I want to argue here. Our point is that even when you reduce the service solely to what the Commission has reduced it to, which is visiting websites and retrieving information service, that capability, which is what the Commission is labeling transmission in its entirety, is not transmission. That is a combination of transmission and computer processing capabilities that gives customers the capability of retrieving information using telecommunications. Not terminating it under the management exception. The management exception wouldn't apply here for a couple of reasons. First of all, with respect to any service, Your Honor, there are two ways of thinking about it. There's the capability that's being provided to the customer and then there is what's going on in the network to generate that capability. When the capability being provided to the customer is what is being described in the statute, the capability of retrieving information stored in remote computers, then that can't be defined as telecommunications management. The reason there's a telecommunications management exception there is that with normal telecommunications, pure telephone calls, even then there's going to be some database consultation going on within the network. So Congress wanted to say that the fact that there's going to be some access to stored information within the network associated with a normal telephone call doesn't make that telephone call an information service because the capability that the customer is getting is still a telecommunications capability. So then what's the meaningful difference? Because back in the days of phones, there were database information processing functioning going on in the background that allowed a phone call to be completed. And I'm thinking even of phone calls where the purpose of the phone call was to get information, not necessarily even to talk to somebody. So there used to be a, I just happen to know this, a sports information hotline, 900-976-1313, I think. And you could call that number and you would get up-to-date sports information, which is somewhat similar to what's happening with the web. And undoubtedly there was information processing going on in the background that made sure that that call got completed so that the initiator could get the information. Isn't that similar to what's going on now in the background that you say has to be deemed an information service? No, it's not. And let me then address directly what it is that the Commission has said is telecommunications management and why they're wrong in calling that telecommunications management. And in particular, there are two things that are going on in the network that contribute to being able to provide this capability to customers to retrieve information that the Commission has characterized as telecommunications management. One of them is caching. And caching, as we discussed in the brief, is when the ISP itself stores the most popular content inside its network. But the caching doesn't change the content, right? I mean, whether it's cached or not, let's just say I cached the New York Times website. Whether it's cached or not, the content, the analytics is identical. That's right, Gerard. The only place that can be changed is on a New York Times website. So it sounds like it makes the statutory definition of telecommunications, the transmission of information without change. No, Your Honor. When the ISP caches the information, it is the repository of the information. The customer is getting the information directly from inside the ISP's network. The ISP hasn't cached the information. The definition in the statute is that transmission is transmission between or among points specified by the user of information that the user is choosing without change. That's correct. And that's what happens with caching. Well, yes, but transmission is always going to be part of any information service. The reason that caching is an information service is it involves storage held by the ISP of the information that is being provided to the customer. And storage of information to provide information to customers, whether the content is changed or not, has always been an enhanced service, an information service. So, for example, voicemail in a telephone network was an enhanced service. Let's go back to BANDEX. So do you think that BANDEX tells us the question the commission has to decide is how customers perceive the offer? That's what BANDEX says. Yes. So is there any evidence in the market at all that customers who buy BANDEXs think they're buying caching? Aren't they just buying access to the Internet? I don't think that customers think or understand or the commission believes they think or understand what technically is going on in the network. Well, no, the commission does think that customers are buying access to the Internet. That's what they think they're buying. That's right. They're not buying caching. No, that's right. They are buying the capability of retrieving information from third-party websites. Now, as to caching, the point that I'd like to emphasize is that the commission itself says that caching is an information service. Even when the content isn't changed, as long as it's provided by third parties other than ISPs. Same thing with DNS. And that's a critical point because... But in most cases, it's not part of the telecommunication service. But it's still performing exactly the same functions. Right. And when you have two services, caching provided by us, caching provided by somebody else, DNS provided by us, DNS provided by someone else, if they are performing exactly the same functions in conjunction with exactly the same service, it can't be that they're telecommunications management with respect to one service and an information service with respect to the other. Why not? Because why not under the statute? Because the telecommunications management exception speaks in terms of the use of such capability for the management of a telecommunications service. And obviously, it can't be for the management of the telecommunications service if it's not the entity that's providing the telecommunications service is providing such capability. Well, I think Your Honor is right that obviously it can't be if someone else is providing it. But what follows from that? We certainly would not let a third party manage our telecommunications network. And so our point is that if customers can choose a third party to provide exactly the same function in connection with exactly the same service, and it's not management when a third party does it, it can't be management when we do it. Is there a phone analog? So, for example, I think directory assistance was part of the basic service. Yes. Now, if a third party comes along and says, you know, I've got a better directory service, a better directory assistance program because I've done stuff that makes it faster, I've got a better list, what have you, and then they came up with that as a competitor and say call my line instead to get directory assistance. It seems to me what would have happened is, although maybe it's not borne out historically, that that would have been deemed an enhanced service or an information service. But the fact that the phone company had its own directory assistance wouldn't preclude there from being that dichotomy. I don't know that that situation ever came up. I don't know if the Commission ever confronted it in exactly that way. But the distinction the Commission did draw, and this was in the 1985 North American Telecommunications Association case that we cite in, I think on page 38 of our brief, is that when there were capabilities that were supporting a normal telephone call, like directory assistance or speed dialing where there'd be a database somewhere which would translate a number to a specific longer telephone number, because that was simply part of the normal telecommunications service, it was telecommunications management. But it said that if instead those things were incidental to setting up a different capability, an information service capability, then it's not telecommunications management because it's managing something else. And so the key question, we think, is what is the capability that's being provided to customers here? And is web access itself an information service? And there are three interrelated parts of the statute that we think establish that it has to be read that way. And one is the text of the statute, which describes, as we've discussed, any service that provides the capability of retrieving or utilizing or making available information via telecommunications. And when a customer retrieves a page from Wikipedia or acquires information about the weather from weather.com or makes available her information on a webpage, that is doing what an information service offers. But these words weren't just put there in isolation. There's a history to them. And the history is that as this court and the Supreme Court said, it codified a preexisting regulatory regime, the FCC's computer regime, and the MFJ, which specifically separated out for non-common carriage treatment those services which provided access to information stored on remote computers. And so, yes. Mr. Kessler, can I ask you to focus on the different way that you're making your brief? Excuse me. That's a major dysfunction. So that part is not just the last mile, right? That's part of it, but that's not all of it, Your Honor. So explain just two things. First of all, how do you define the last mile? That's number one. And number two, explain to me, if you could, why that makes a difference in terms of how we apply Band X in this case. Thank you, Your Honor. Yes. First of all, we define the last mile as the dumb pipe transmission facility. As what? The dumb pipe. The transparent transmission facilities that connect the customer to the ISP's computer processing facility. Just up to the ISP's computers. That's right. Not including the ISP's computers. Correct. What Justice Scalia called the conduit for the already assembled information service at the ISP. In his dissent. In his dissent, yes. But that's what we are referring to as the last mile. But I want to be clear that it's not simply, although it's the case, that everybody in Brand X was just arguing about the unbundling of the last mile. They were. It's that Brand X itself was about whether that dumb pipe could be unbundled or was required to be unbundled and whether it was a telecommunications service. Nobody on the court disagreed that there was an information service going on at the ISP's computer processing facilities when it provided WebEx. No one disagreed that the commission couldn't reasonably interpret the service that way. That's what the court was doing. It was looking at whether or not the commission's interpretation of offer was reasonable and the court actually said that the entire question of whether the products here are functionally integrated. That's the Brand X situation. That's the components of a car. This is a spare part. They're functionally separate. They're cuts and leaches and that's the position the commission's taking here and the court goes on to say choosing between those two is something Congress left to the commission. Yes, and so since there is an information service going on at the ISP facilities that already assembled information service that Justice Scalia was talking about, the commission may have some discretion to disaggregate some transmission component if it leaves an information service component on the table. Nobody in Brand X disagreed that there was pizza making going on at the ISP and what the commission has done here that is different and that is not within the ambiguity addressed in Brand X is say that the entirety of the service that is being provided at the ISP's facilities, all of that computer processing is exclusively a telecommunications service. They didn't quite do that, right, because if you look at the suite of services that was deemed to be obviously or in your view obviously information services in Brand X, that included things beyond Web access. It did. News groups and e-mail and other stuff that happened at the portal that is still deemed an information service under the rule today. No, that's right, Your Honor, and it's not my contention that Brand X established as a matter of law that Web access is an information service. I'm making a much more modest contention that Brand X doesn't stand for the proposition the commission cites it for, which is that there is an ambiguity in the statute that the court has recognized that says the commission is free to determine there is zero information service capability in what the ISP does in Web access because Brand X wasn't about what's going on in the ISP's computer facilities. Justice Thomas said it's unchallenged that there's an information service here, so the court didn't go on to address that part of it. The whole thing was about the dump pipe, which had historically been unbundled and required to be offered on a common carriage basis, and Justice Thomas said you could think of it. Even if you're completely right about that, don't we still have to apply the tension of Brand X here, which is that how this case comes out depends on what offer means and offer is an ambiguity term that the commission can define either way and isn't the question whether the commission's definition of the service today in telecommunications is reasonable. Isn't that the way? If that's how you want to look at it, explain to me why. Even if you're right about the last mile. If we are correct, as we think we are, that the information service definition is not ambiguous. No, no, no, go back to the last mile point. My question is, even if you're right about the last mile, don't we have to apply that test and doesn't the Brand X itself say that whether an offer is information service or telecommunications is ambiguous as left to the commission to decide? And that's what I would resist, Your Honor, which is the court in Brand X said that offer was ambiguous and it said that telecommunications service was ambiguous, but it never said that information service was an ambiguous term as applied to what's going on at the ISP facilities. And so we don't think Brand X stands for the proposition that there is a recognized ambiguity in the statute as to whether there is some information service going on at the ISP facilities that can't be regulated under Title II. If the information service also fits under the management exception, how does that help you? Well, if the information service fits under the management exception, we would lose. But our position is that it doesn't fit under the telecommunications management exception, that caching and DNS and the other functions we've described aren't about managing the telecommunications network. They are not about things that are being done internal to the network to make the network work. They are customer-facing services that support the information service capability of providing the customer the ability to retrieve information from websites. If I could just take a few moments to address the interconnection point. Sure. This court held in Verizon that EDGE providers are provided a service by ISPs and ISPs act as common carriers for EDGE providers when they carry their traffic. And the question in Verizon was whether the ISPs were being compelled to act as common carriers in doing so. Here, there's no question that the order has compelled ISPs to act as common carriers with respect to EDGE providers because the commission has said that EDGE providers can file complaints under Title II against ISPs. But the commission didn't reclassify that separate service as a telecommunications service. And under Verizon, we believe that that's unlawful. And that's particularly true, we think, because of the term in the statute that says that a telecommunications carrier can be subjected to common carriage only to the extent that it is providing telecommunications service. And because the commission didn't reclassify that particular service to EDGE providers as a common carrier service, then the commission can't subject telecommunications carriers to common carriage to the extent they're providing that service. So what the commission said, I think, in response to that is, in some sense, you could look at the back half and call it a separate EDGE providing service. But in some sense, you could also look at that and say, it's the second half of the service that's being provided to the end user because that part of it's essential to make sure that the request made by the end user, in fact, is honored and the information gets back to it. And so, therefore, we didn't have to reclassify the EDGE facing half because we reclassified the consumer facing half, which necessarily subsumes or encompasses this other aspect. Well, that is what the commission said, Your Honor. What the commission said, in addition, is that we make, the commission said, an implied promise to every retail customer that we will carry traffic to them on a common carriage basis. And that's just a complete fiction. We don't make any such implied promise because it's not true. We don't engage in common carriage relationships with EDGE providers or other backbone providers. Those are privately negotiated agreements where the terms are very individualized and upgrades and costs and things like that are all individually negotiated. So, of course, we didn't make a promise of that sort. There's nothing in the record that suggests we made a promise of the sort. It's just words that the commission put there in order to be able to justify subjecting interconnection arrangements to Title II and permitting EDGE providers to file complaints against us without reclassifying that service. And the history here is very telling. But is it at least true that if you had blocking at the, in what you're describing as the EDGE facing part, that would necessarily be blocking over the last month? It would, Your Honor, but we're not just talking about blocking. We're talking about whether 201 and 202 of Title II apply to those arrangements and whether EDGE providers can file suit alleging that any rate or practice in connection with that arrangement is just or reasonable. That's pure common carriage. And even if one were to say that there was a commitment that we wouldn't block content, this takes us well beyond blocking content. This takes us into the world of pure common carriage with respect to an arrangement that the commission hasn't reclassified. And the way this developed, originally the chairman said in a separate statement accompanying the NPRM that interconnection was best addressed in a separate proceeding. But then after the president called on the commission to adopt the broadest possible regulations, the chairman then said, okay, this wasn't a formal amendment to the NPRM. He just issued something like a press release saying we are going to reclassify the sender side, the EDGE side of the transaction. But then Google came in and said, please don't do that. That would hurt Google. And days before the order came out, it switched, and they pulled out the sender side reclassification part. That's what Commissioner Clyburn said. She said that she was grateful to the chairman in her separate statement for removing the sender side reclassification. But that's like the Cheshire cat. The body disappeared. The whole legal rationale was suddenly gone in a matter of days, but the smile was still there, the assertion of jurisdiction over our interconnection arrangements. And with the body removed, there really was no basis for this at all. And, you know, the other rationale... Why doesn't, why, explain why, why it isn't so, why the commission's role when it says that the, I hate to keep going back to Brand X, but why, you know, they say that they offer the Internet providers, access providers are looking to consolidate and cause interconnection to the Internet. They don't cause that. It's part of that service. For two reasons. First, because it is a separate service, as this court recognized. But second, because whatever that offer might say about that separate service, it can't possibly be that we are saying that we are going to provide it on a common carriage basis between us and the edge providers. We don't promise that to anybody because we don't do it. And the commission itself says in the order that it expects that these interconnection arrangements will continue to be individually negotiated just as they have in the past. It's pure common carriage. And so when the commission says we have made a promise to retail customers that we will engage in common carriage relationships with edge providers so they can enforce that under Title II, our answer is it's just not so. And there's nothing. There's no footnote. There's no citation. There's no record evidence to suggest that that promise has been made. They've just deemed there to be a promise because they want to be able to apply Title II to these interconnection arrangements without reclassifying them. And that, we say, is unlawful. The other rationale they offered was that, and I suppose it's in some ways the same thing, that these interconnection arrangements are in connection with the retail service. But the in connection with provision in 201B says that's rates and practices and classifications in connection with a service can be covered. Not that a separate service, quote, in connection with the service can be covered. And because the statute says that a telecommunications carrier can only be subject to common carriage to the extent it is providing telecommunications services, the commission can say that a separate service is in connection with a Title II service and is therefore subject to Title II without reclassifying it. And with the Court's permission, I'd like to reserve the remainder of my time. All right. Thank you. May it please the Court. This order is designed to put into place, after a decade of effort, legally sustainable standards to keep the Internet open. The order defines a specific broadband transmission service within the statutory definitions as set out in Title II, within the discretion identified by the Supreme Court in Brand X. And Brand X is the starting point for our view of the order. The critical question in Brand X was whether the term offer was reasonably construed by the commission. And the Brand X Court said the term offer, when applied to a commercial transaction, I apologize, I'm quoting, is ambiguous about whether it describes only the offered finished product or the product's discrete components as well, a question it went on to say that turns not on the language of the Act but, quote, on the factual particulars of how Internet technology works. And so what the commission has done in the order is to look at how the technology works today. And what it has found is that there are two separate things being offered in a retail package. In this sense, mirroring language that Justice Scalia used in the Brand X dissent. One is a transmission service defined in the order as the capability to transmit data to and receive data from all or substantially all Internet endpoints. That is a transmission service in which information moves without change in form or content. But can I interject and just ask this one question? It's true that at that level of generality, what the commission did is what appeared to be sanctioned by the Brand X Court, i.e., you take something that was deemed by the commission to be a composite information service and kind of resegregate it into a transmission component and an information services component. At that level of generality, I think everybody, even the other side I think, would say that Brand X sanctions that approach. But their point is that you've done one thing more than that and the difference is whether you think that one thing is a big thing or a small thing. But the one thing more is that there was a piece of what would have been the information services component, which is access to the Web, and you've put that into the transmission component. And the question is, is that just sort of the type of thing that lies within the commission's discretion to do, or is that forbidden by the statute because that's necessarily part of information services within the meaning of the statute under the text and the way that those terms have become to be known based on the commission's prior experience? That's something that's new. The Web access portion is now part of the transmission. Yes. It wasn't before. I apologize. Your Honor, it is not new. The advanced services order that the commission enacted in 1998 classified DSL as a Title II service, as a telecommunications service. And that DSL service provided the same ability to use packet switch networks to reach any destination, including whatever Web sites were available in the 1990s. In fact, the telecommunications has never been limited to certain destinations. The assertion that you have – Can I just ask a follow-up on DSL? Of course. So DSL pre-2005 was a telecommunications service. But I thought that what happened with DSL was if we use AOL as the example, DSL would take you to the AOL portal, but then there was a separate gateway from that portal to the Web, and that was an information service. Yes, Your Honor. Yes, that was the way the network was used. But the definition of telecommunications did not depend on what destination a user chose. So if one went to AOL, then one would have a different path to the Internet. But browsers were available in the 1990s if one had a browser on one's PC and used it to go directly to a Web site, then the DSL network would take one directly to the Web site. In other words, the petitioners – these petitioners are asserting that there is some sense of destination within the meaning of the term telecommunications. Certain destinations are on certain destinations or not. But there's nothing in the statutory language that talks about the destination. When you had the browser that would take you directly to a Web site, was there a broadband provider in the background that was doing some information processing at its server that made sure that you got to that Web site? There was always – and this is another point that takes us to the telecommunications management exception. There was always computing functions going on. There was never the last mile that consisted of a wire and no computing. That cannot be found in Boondocks, for example. So under the Computer II inquiries, the Commission stated as early as 1980 that intelligent features run the network. And so before the passage of the 1996 Act, under Computer II, the Commission recognized that data processing, packets, switching, storage. These were all instruments of telecommunications so long as they were used to facilitate the efficient retrieval or movement of information without change in form in content. That approach was largely adopted by the telecommunications management exception and it explains the Commission's reasoning in this order in a very direct way, if I might. Looking at the telecommunications path, which I think unquestionably exists, the Commission also looked at other functions and it divided them into two groups. One, and I think these petitions don't contest this, was functions like email that was viewed as separate information services add-on, not critical to what consumers thought they were getting. But then there was DNS and caching. And DNS and caching were analyzed under the very statute that Brandeis found to be ambiguous, the definition of telecommunications management exception, which says that that which is otherwise computing. I mean, the point is it is otherwise computing, it is otherwise an information service, but it is not to be treated as such if it is used for the purpose of managing a telecommunications system or service. And so the Commission went on and looked at DNS and looked at caching and it found that both were used to facilitate the movement of information without change in form or content. DNS. DNS is a routing function. And you're talking about the way the Commission is viewing DNS and caching now in the order. Absolutely. I appreciate that point because I should say as to everything that I'm describing, what the Commission is doing is saying this is what exists today. And we are applying a statute under Step 2 of Chevron as found by Brandeis to the circumstances that we find today. What about, Mr. Cox, caching can't be one thing for telecommunications service or another thing for non-telecommunications care? It's like saying that if I have a screw that's used to hold together a piece of furniture and then an automobile and then in a medical procedure, this screw has to be treated in the same regulatory regime, even though furniture is regulated different than automobiles in medical procedures. The way the statute works is not what is the technology. There can be general purpose technologies. It's whether the technology in the particular instance is being used to manage a telecommunications system or service. DNS and caching both are being used by a service that's defined in the order to provide efficient movement of information. DNS, for example, is a writing function. It helps move traffic to the destination intended by the consumer. Caching is storing of preexisting content, no original creation of content, in a way that also facilitates routing and that allows the network, for example, to avoid costs that would be incurred if it had to go to a further distance to get that preexisting content. Both, therefore, fall easily within a telecommunications management exception. Okay, so let me ask you a non-Brandeis, non-statutory question. Stats to this court's rise in decision. The commission seems headed for regulating under 706. And you may know the commission even called it the blood print offered by the D.C. Circuit. That's the commission's word, not mine. So how do you describe the commission's reason for abandoning that approach? What's the policy explanation for that decision? So the policy explanation is that as we listened and as we learned from the record compiled in response to the Imperium, we considered the question of what the service was and how it had changed from the last time the commission had really dug deep, which was the cable and rod and mortar. And what we saw was that what was being provided was not true at the time of Verizon also. It was true and the commission had not chosen to consider Title 10 in the same way it did. Let me just focus my question. The question is what after Verizon, after this court's Verizon decision, and after the commission focused its attention on proceeding under 706, what changed its mind? It could have all changed circumstances, right? The circumstances are all essentially the same. So what's the crispest answer? The crispest answer I have for that because I couldn't find it in the order. I hope the crispest answer is around the following. The commission looked at what kind of practices would most disrupt the VHS cycle. As it looked at the record, it decided that some kinds of bright and early rules were necessary and that the offering qualified under Title 2. I'm sorry to interrupt you, but I understand all that. But that was our turn after the court's Verizon decision. It was your turn. But the record had yet to be compiled. It had to go to the commission and conclude that the authority it had over 706 wasn't adequate and that it mattered to reclassify. That's my question. It had to be a different perception of what was happening. The perception became, Your Honor, that the commission thought the best policy was to use the kind of bright and early rules that would not be available absent the Title 2 classification. And those bright and early rules were necessary because as it looked at the ability of providers to disadvantage the edge, it concluded that the best approach was to recognize that the service was part of its own and that the practices needed to be treated as chronic heritage. And now, precisely, Your Honor, with this court's Verizon opinion, which gave the commission a choice, one could proceed under 706 and not use regulations or rules that constitute chronic heritage per se, or it could use those kinds of bright and early rules if it thought the public interest would be served, and if a reliable interpretation of the statute and a reliable exposition of the facts would support the use of those rules. Counsel, can we go back to the last argument during Mr. Keisler's presentation? Yes, Your Honor. Now, it turns out that the burden of all these rules falls upon what in the background of common carriage would be called the shippers, the edge providers, right? And yet the commission, apparently for good reason, chose not to reclassify the service to the edge providers. Yes. That seems totally anomalous to me. Your Honor, I wouldn't say all the burden falls on the edge providers. Surely the burden on the edge providers will fall on the customers. Don't get me wrong. Your Honor, the analysis goes both ways. First of all, let me just say the edge service and interconnection are not synonymous, and we should not think that they are. So if I might address interconnection first, Your Honor. Your Honor, interconnection is an agreement, a contract, made in connection with the provision of the broadband service. It's inherent in the service in the following sense. The service promises consumers that they can send data to or receive data from all substantial Internet endpoints. The way the Internet, well, the term Internet itself expresses the fact that there are multiple networks that need to be able to exchange traffic for the Internet to work. So the service that's being offered, that's being promised, is the service that includes the ancillary activity of making contracts in order to allow the traffic exchange so that, you know, connectivity can be provided. This is a well-established approach under Section 201B and is well illustrated by this Court's decision in KBIRLS v. FCC, which is cited in our brief. And that case involved international telephone calls where the FCC put a limit on what a domestic carrier could pay to a foreign carrier for the delivery of the traffic into the foreign carrier's network. And the foreign carriers challenged the order, saying you have no jurisdiction over us. And the impact bias is not permissible, but the Court said three things. It said, first of all, the regulation stems from the regulation of the domestic carrier. There may not be any assertion of authority over the foreign carrier. Secondly, the fact that there was... I don't see that that helps you in this case. I apologize, Your Honor, for taking... It said that it makes no difference if there is some impact on the other carriers, but thirdly, National Gas First, I apologize, the contract here, the contract there, the traffic exchange contract, was adjudged to be in connection with the provision of the Title II service to domestic customers. And so in exactly the same way, the interconnection agreements here are not a separate service. They are simply arrangements made in connection with the provision of this Title II service to these Title II customers. So the interconnection, you're drawing on the statutory language in connection with it. And I thought that was your fallback argument. And the reason I ask about that is because, and classified as a fallback argument is the following, that under Verizon, if something is an information service, it can't be regulated in a way that treats it as common carriage. And so the fact that it might fall within in connection with seems like it runs into a Verizon obstacle. I think not, Your Honor. I think not for this reason. But having it identified in Verizon was that this very same service, this broadband service, had not been classified as Title II service. There was no Title II service in sight. There's not been a classification of a Title II service. And what I believe cable and wireless stands for is the proposition that if the commission is acting within its authority in regulating that service that has been classified, the fact that there is some impact on others who are not regulated is not disqualifying, and a contract with others can be viewed, should be viewed, as in connection with the provision of this service under review. Does the commission get the right of that interaction list to prevail in the air connection issue? We do not. Because what we have also said is that the service here to the edge, as it were, is not a derivative of the promise being made. It is subsumed within a promise being made to the customers to provide them the ability to go in and out of the Internet. And in that regard, it simply is an obligation undertaken by these petitioners when they go to customers and say, we're going to provide you a service that allows you to go everywhere. We found implicit in that a promise to make those arrangements to be able to carry out the promise. And thus we regarded it as simply derivative of the promise that has been classified. And that is practically how does this work. So, for example, if there is blocking, if there's an agreement that enables blocking on the edge-facing part of this, so you're talking about, I suppose, an agreement between the broadband provider and somebody at the edge or somebody that's involved in the traffic exchange in the interim, then the fact that you're not applying the rules to that would mean that there's no anti-blocking problem as such. Correct. It would be that that agreement is then subject to the general 201 authority to- No, it would mean that the action of the provider, the broadband provider, assessed under 201, would examine as to whether there's an impact on the consumer who is the customer of the Title II service. In other words, for any action to be taken, one would look at, has there been an impact on the consumer of the Title II service? If there has been, then it would be within the ambit of the commission's authority under Title II to take action. If not, but there was something else going on with the edge-only connection, that would be beyond the scope of the commission's authority. But wouldn't that necessarily, I thought, if your theory is that the edge-facing part is assumed within the consumer-facing part, then every edge-facing action is going to be related to the consumer-facing part. But it would not necessarily have an impact, Your Honor. In other words, the legal question for the commission would be, has there been some kind of adverse impact of the kind prohibited by the rules? So, for example, there could be, right? The no blocking rule says a consumer can't be prohibited from getting to a certain website. But it would be possible for the provider to reach exactly the same outcome by simply refusing to exchange traffic. That would be a circumstance in which there would be an impact. But every discussion with an edge provider, does that mean that in every negotiation between an edge provider and an ISP, if the ISP digs in its heels on a proposition and the edge provider digs in its heels, and there is daylight between them, the ISP is in violation of the no blocking rule? It does not, Your Honor. Why not? Because the no blocking rule only applies to the activities on the network, not the activities between the network. In other words, to the transmission of traffic across the broadband provider's network, not between. And the commission was very careful here. It explained why we took the position we did at Senior Connection. Those areas were. I'm sorry. I didn't understand the question. What's the medical result in blocking content from the end user? I'm asking a distinctive question. I'm sorry. The impasse between the edge provider and the ISP. Yes. You can't work out a deal. In the absence of a deal, nothing gets transmitted. Yes. So, I have to say, Your Honor, as a technical matter, that would not be a violation of the no blocking rule. The question would be whether the broadband provider acted reasonably in pursuit of its promise to assure the ability of its consumers' traffic to the IRR web. And therefore, if a complaint were lodged with the commission, the commission could look to see if the conduct of the broadband provider were of the kind or quality as to harm the consumer's ability to use the service as promised to him or her. In that circumstance, the commission was very careful to say it was not using bright line rules, precisely because it did not want to intervene. Precisely because it said there were two competing priorities. It cast a shadow over the transaction. What it said was it recognized that the potential exists for adverse harm to come to consumers in violation of the promise made to them. The complaint in this situation, is it some consumer who says, I understand what's going on upstream and it's going to have downstream effects on me, and so I want to make sure that that company that I don't know undertakes a better negotiating posture, or is it the EDGE provider who's involved in negotiations who then submits the complaint? Two points you're on. We do not use Oracle to extend the requirements as to who can file a complaint with us. So the complaint could be filed by anybody, including the EDGE provider. But the question, this is my second point, would not be whether the EDGE provider was being hurt. It's whether the consumer was being hurt. So in that sense, the only showing that could justify action by the commission would be action that would be harmful to the consumer. But that seems in deep conflict with the commission's position on paid prioritization, because there the charge, as I understand it, would be assessed on the EDGE provider, and the commission feels so strongly about that charge that it makes a complete ban on it, regardless of commercial reasonableness, regardless of how time-sensitive the special, the service the EDGE provider is demanding might be. Your Honor, the commission took the following view. In circumstances of paid prioritization, given it not in network capacity, there would be an adverse effect if there were some fast lanes slowed on other lanes. But in the network connection... The record, I know the commission doesn't acknowledge this, but the record is ambiguous on the question of whether an additional fast service prioritization of time-sensitive service would, in fact, impair service to the aggregate. The commission, we have the record, which I believe is very well verified in the name of the APA, that there would be such disadvantage. But Judge Williams, to your point, the difference with network connection was the commission said, we don't know as much. We don't have the same findings. There are competing narratives. And so we wanted to be able to ensure that there's not a version of our rules, no harm, the fallout of practice through our time and guidance. But we do not want to be involved heavily in a connection agreement. We want to take a wait-and-watch attitude. And if problems emerge, then we could act. And I might add, Your Honor, if problems emerge and the commission acts, then of course that can be challenged on an as-applied basis at that moment. Now, the only explanation that I saw that was really intelligible about the difference in treatment between paid prioritization and paid peering arrangements was the commission had so much experience with the area of paid prioritization, which is odd because no ISP has evidently yet proposed it, right? While paid peering arrangements appear to be ubiquitous. That's paragraph 128. Yes, Your Honor. The commission in its 2010 order adopted a no discrimination rule that this court in Verizon held to be equivalent to common carriage. So the commission in 2010, in other actions like the broadband NRI, and then finally in 2015 had thought about this kind of issue of paid prioritization for at least five years. Whereas, as to interconnection, the commission was desirous of ensuring that it did not take interaction partially and we have in front of us I would submit a facial challenge to regulation of interconnection that would be equivalent to what a WRA rules. What did you come up with in those five years? Because I have to say that the idea that a charge for prioritization sounds like a charge for refrigerated cars on a railroad, right? It sounds like, you know, you get something special, you pay something special. That is clearly not discriminatory. Or if it's discriminatory in some technical sense, it's an entirely reasonable discrimination. Two points, Your Honor. What we came up with was the notion that unlike the refrigerated car and the train that you posit, here the prioritization of some traffic would only be valuable if there were congestion, otherwise nobody would pay for prioritization, and that therefore it would work harm to the other traffic. That doesn't necessarily follow because some packets or some types of service are inherently time-sensitive. Latency and jitter and so forth are important with respect to them, while they're unimportant with respect to other service. And so it seems the idea that there should be a channeling of services for which latency is not a problem against services for which it is is utterly reasonable. And so the commission has noted, for example, that users can exercise control, users can buy more or fewer tiers of service faster or slower service, but it concluded that the abolition of the banning of paid prioritization was necessary to preserve the virtuous circle. For example, one of the illustrations of the paid prioritization rule is the following. It prohibits a broadband provider from favoring its affiliate over other affiliates that might well be competitors, as in a superior business circumstance. You can address that as anti-competitive, as you know. Right? Yes, Your Honor. We can address it in that way. You don't have to have a flat ban on paid prioritization. No. There are, of course, multiple ways to solve the problem. One of them wipes out a lot of perfectly innocent relationships and one of which doesn't. The commission has acted, we believe, within the boundaries of the arbitrary and capricious standard of reviewing these kinds of fact questions. In other words, to use the phrase of the driving court, we saw a rational connection between the threat of paid prioritization and the actions that the commission took. And so I submit to you, Your Honor, that what we did falls within both a reasonable interpretation of the statute under Band X and a reasonable rendering of the facts under the APA. Counsel, going through the record, you see comments by at least three former chief economists for the FCC, not necessarily packaged under their names, but packaged, one of them incidentally being one who was chief counsel during most of the gestation of this rule, saying essentially that there are much simpler, much more discreet, much less damaging ways of achieving the pro-competitive goal that the commission says it has. There's no response to those comments. No. No response. And I don't mean just by name. There certainly is that, but there also isn't by substance. Your Honor, if I just may interject, as well as, of course, there has been no challenge to the paid prioritization on an APA ground that is not parallel in front of the court. There isn't. I mean, I was saving that for the next round. But in fact, in the next round, the application of Section 201 is challenged, and the redefinition of 201 is challenged. Yes, Your Honor. And the commission explicitly bases its changed interpretation of 201 on the dread of paid prioritization. Yes, Your Honor. Section 292. If I could address the point about economics. The commission looked at the circumstances and saw that a case-by-case approach led, it felt, disadvantaged edge providers who tended to be small and numerous, because they would have to engage in a case-by-case approach that might itself be the kind of burden that would lead to under-enforcement of a principle. It seems to me the only edge provider we have as a party in this case is one who is claiming that paid prioritization will stand in the way of his business model. I think, Your Honor, that the intervenors, Mr. Russell, will represent, in fact, include edge providers who take quite a different view. And I would note, for example, in an affidavit that was filed by intervenors in connection with the stay motion that this court heard earlier this year, there was an affidavit of an investor who said very expressly that without assurance that small start-ups could get to their intended customers, then there would be deterrence on investment that would limit edge innovation, edge provider innovation. In fact, I believe, Your Honor, that is entirely consistent with the reasoning of the Verrilli Court in upholding the use of the virtuous circle. I guess the obvious question is why wouldn't a general rule against discrimination in prioritization pricing completely solve that problem? Because not every issue in front of the commission is only a question of economic discrimination. 201 has been used, for example, to assert that certain practices are not just and reasonable in and of themselves. And 706 can be used to provide a basis for commission rules that would be co-encouraged so long as there has been a classification of an ROL service as a Title II service. And so these additional sources of statutory authority do not rest only on the non-discrimination principles of Section 202. Actually, I don't know if the commission is doing traditional rate-making anymore, but it is a standard principle of that that the users who create a cost should bear that cost, and your ban on pay prioritization completely turns that upside down. Well, you're right. I think now, if I may, the notion of the virtuous circle, as explained by the court in Verizon, is that the broadband providers have both an incentive and an ability, and the ability, both technical and economic, to interpose themselves between customers and the edge, and that that action, which is harmful to the consumer's ability, suppresses customer demand, and while, in turn, lower innovation both at the edge and on our network. You have in the record a lot of submissions saying that that purpose can be achieved much less dangerously, submissions to which the commission did not reply. Your Honor, I believe that the order carefully considers the facts in front of it and adopts a reasonable approach consistent with the Verizon court's analysis in order to protect the virtuous circle. Let me just, by way of background for all this discussion, make sure that I understand the basic position as to how the virtuous circle is said to work. Basically, the idea is, I think, an explicit recognition if the imposition of common carriage on the ISPs certainly will not in itself encourage any investment by them, but it would do so indirectly by enabling the edge to blossom better than it has in the past. In the sense, Your Honor, that it would stimulate consumer demand for broadband, and with greater demand for broadband would come greater incentive to deploy all of this. Yes. Exactly right, Your Honor. So the plausibility of that depends on the proposition that there is a significant, non-trivial group of potential edge providers out there who are being afforded under an arrangement which does not involve the various bans imposed by the order. Well, Your Honor, I think the Commission is entitled to make a predictive judgment based on the record in front of it as to what would be the circumstance. And I say that... It's usually given great definition, predictive judgment. Yes. It's true. It's a little odd in this case because the Commission has time and again stressed the beneficial impact of its previous set of rules. But the Commission has stressed two things, Your Honor. Since 2005, the Commission has said it will take action, it will take effective action, in order to maintain and protect an open Internet. It has, back to the 2005 prior set of statements, said it would protect unequivocally a consumer's ability to go to the application services and content of his or her choice. In other words, the decisions made by this order are consistent and they follow through from that decade-long goal of ensuring that the Internet remains open and represents, I submit, a reasoned reading of the record and a reasoned interpretation of the statute in order to pursue that legitimate goal. If there are no further questions... Go ahead, Mr. Russell. Good morning. May it please the Court. In the time that I have, I'd like to address two issues. First, petitioners, what they described as their principal contention, which is that offering access to third-party websites falls within the statutory definition of an information service. And second, this question about reclassification with respect to the edge-facing service. I understand petitioners' principal argument to be twofold with respect to web access. One is simply providing the capability of accessing a third-party website, no matter how it's accomplished, falls within the definition of an information service because it provides a capability of accessing and manipulating information on that website. On that view, providing a pathway to Netflix is the same as being Netflix, and that can't possibly be right. And what it ignores is the requirement that an information service be provided via telecommunications, which makes clear that a telecommunications pathway in and of itself can't satisfy the definition of an information service. And they don't seriously contest that providing that communications pathway, not only over the last mile but all the way to the edge, meets the definition of a telecommunications service because it is transporting a packet of information that is created by the user to and between the destinations of their choice without any change in its content. Their claim that providing that bare service becomes an information service simply because it results in the capability of accessing websites cannot possibly be right. If it were a bare telephone line, it would be an information service. But when you say it cannot possibly be right, it makes it sound like it would have been unreasonable for the commission to reach any other conclusion. I don't understand the commission to ever have said that that bare transportation capability constitutes an information service. Instead, what I think the commission has adopted is their second argument, which is that that capability is provided by some under-the-hood computer processing that's not visible to the user, things like DNS and caching. And that argument is wrong as well for the reasons that have largely been discussed. The question is not about the nature of the computer processing, what it does. It's how it's used. And the same service can be an information service when used by somebody else for a different purpose. And within the telecommunications management, when it's used to facilitate the operation of a telecommunications service, for example, a database of names and telephone numbers, when provided at whitepages.com, it's clearly an information service. But when used to provide directory assistance by a telephone company, falls within the classic exception of the telecom management, before that is the adjunct to basic service. And that's all that DNS does here. It helps the company translate ordinary English explanations about where the user wants to go into the computer gobbledygook that the computer system needs in order to get them where they want to go. With respect to interconnection, I would think about the question this way. Even if you thought that only the last mile service is a telecommunications service, that would be sufficient to render these providers telecommunications providers and therefore common carriers subject to Title II. Title II then tells us the scope of permissible regulation of those common carriers. And it says the Commission has authority over practices for and in connection with that service. Practices for and in connection with that service aren't limited to practices that directly implicate the relationship between the customer, the common carriage customer, and the provider, but can also reach practices elsewhere in the network that have the same impact as blocking, for example, at the threshold of the user's computer as opposed to the threshold of the network. The Commission reasonably concluded that interconnection practices can have the same purpose and effect as the kinds of practices that they had abundant reason to believe were interfering with or threatened to interfere with the virtuous cycle here. Why don't I talk about the Commission's alternative or primary justification, which is that interconnection is subservient in the offer to the end user? Well, I'm not sure that it's all that different at the end of the day because either way, what the Commission has said is that you have promised to transport information between the user and the edge of the Internet. In order to do that, you have to have interconnection agreements. No company can fulfill that promise without them. And the interconnection disputes manifestly can interfere with the fulfillment of that promise. And all the Commission has said here is when those disputes interfere with the promised service, they will assert jurisdiction over that. They have not said, by the way, that they are going to exercise this power in order to ensure fairness to the edge providers. They have made clear that the only purpose of taking jurisdiction over these disputes is to protect the consumer experience at the end. Can I take you back to old-fashioned rate regulation? The telephone companies and all the other common carriers that were subject to traditional rate regulation had to buy their inputs. And the price they paid for their inputs became relevant in setting their rates. But did the FCC or any other of the natural monopoly regulatory commissions ever purport to actually regulate those decisions? I don't know if the other statutes have an interconnection with race, but so let's stick with the FCC. Did they ever try to regulate those? Doesn't that tell us something? Well, let me answer it in this way, and I hope it's responsive to your question, which is that it has always been the case that common carriers, telephone common carriers, were classified as such by virtue of their relationship with their end-user customers. And one of the obligations that was imposed on them was, in fact, interconnection. They had to interconnect their networks with each other. And that wasn't because anybody understood them to be holding out interconnection to other networks on a common carriage basis. The commission was never required to classify that as a separate service, a separate interconnection-facing service. And as a consequence, they had to interconnect. And disputes about those interconnection agreements have always been subject to the jurisdiction of the commission. And I don't think that the commission has done anything radically different here. And it certainly falls within the scope of their power under Title II to reach practices that have a manifest harmful effect on the use that common carriage customers experience. And the commission had abundant evidence that this kind of interconnection dispute could, in fact, disrupt the service. It recited evidence in the record where a dispute with Netflix and some ISPs had led to broad degradations in quality that basically made the Internet unusable for millions of users for things like video conferencing or telework, that the commission has abundant reason to be concerned about this. I will say, however, that the objections to the interconnection piece of the order have a hypothetical air to them. The only thing that the commission has said at this point is that it's open to hear disputes about this in the future. It hasn't said what particular rules it will impose on them, other than that it will view it through the framework of Title II. And, Mr. Counsel, does anyone have anything to say about the debate, Judge Williams and Mr. Stilett, were having about telepolarization? Well, I do, again, want to emphasize that I don't think that these petitioners have challenged the rule on its face as unsupported by the evidence. At best, they have said that it does not fall. Now, the counsel to come up in the next phase definitely challenged the application of Section 201. And you look at the commission's justification for applying 201, and it's entirely based on a notion that paid prioritization would impose a harm hitherto unseen by the commission, a harm of extraordinary dimension which is never spelled out. I would like to respectfully disagree, because I think the challenge here is to the use of Section 201 to regulate that relationship. What they say is that this is not a common carriage relationship. No, no, no. The next set of counsel talk about the commission's historic interpretation of Section 201, which it switched here. But, again, I don't think that their complaint is the one that you've identified, which is that there is not an adequate factual basis to think that a paid prioritization rule is necessary. They are complaining about whether this relationship instead of conduct falls within the scope of Section 201. This court will have ample opportunity later to resolve that question. Okay. Thank you. Okay. First, I'm going to ask you, Counselor Hibble, if you could try. Thank you, Your Honor. I'd like to begin by going to what was Judge Srinivasan's first question of FCC counsel, which is, Your Honor said that access to the Web does at least seem to be a new piece of it, and how has that been treated? And what I would like to explain is that there are two sets of very important authorities that have always established that access to the Web alone is an information or enhanced service. And even if, Judge Tabel, you believe Brand X requires us to be in Chevron Step 2 rather than Chevron Step 1, these authorities would bear on the reasonableness of the commission's determination here. And the first set of authorities are the regulatory and MFA history, which quite clearly tell the regulatory, the Computer 2, and MFJ history. And the words here were written and put into the statute to incorporate that history, as the Supreme Court and this Court said. Under the commission's rule defining enhanced service, any service that, quote, involves subscriber interaction with stored data was an enhanced service. And after the 1996 Act was passed, the commission said that everything that satisfied our rule on enhanced services was now an information service. And under the MFJ, Judge Green said that the information service definition there, which was incorporated virtually verbatim into the Act, included services that provided, quote, mere database access. And what he said was that when telephone companies, because then it was telephone companies, when telephone companies provide the infrastructure necessary to access the information services provided by others, that, too, is an information service. So to the extent, as the Supreme Court and this Court have held, that regulatory history has been codified in the Act, that all points specifically in the direction that web access alone is an information service. And the other set of authorities is what Congress wrote into the Act in Section 230. Because in Section 230, Congress made it the national policy of the United States that the Internet and other interactive computer services should be unfettered by federal regulation and specifically defined interactive computer services as any information service or system including specifically access to the Internet. So purposes of this section, right? Yes, but the statement of national policy that interactive computer services should be unfettered was in that section. And so certainly that definition that specifically included access to the Internet was part of the national policy that Congress wrote into the text of the Act that said it should be unfettered by federal regulation. And the federal regulation that Congress was talking about surely included at least the common carrier regulation from which these services had historically been shielded under the FCC's Computer II regime. So we think that, and there's no, although I understand the Commission relies on Brand X for its discretion, all of the authority that actually addresses the question of whether Web access standing alone is an information service, all of it exclusively points in the direction that it is. And again, we think even if the Commission's decision isn't regarded as failing Chevron Step 1, it should fail Chevron Step 2 because the whole idea of Chevron is that Congress has, in certain instances at least, delegated to the Commission the prerogative to make certain judgments to fill in gaps in the statute. But the Congress that wrote that access to the Internet should remain unfettered by federal regulation wasn't, we think, delegating to the Commission the power to decide that access to the Internet should be treated as common carrier. Can I ask a follow-up on that, which is that that harkens back to the 230 language, the Section 230 language. Now, as to that language, couldn't you say the same thing about DSL? No, Your Honor. DSL was regulated only, that was just the dump hut from the customer's facilities to the ISP facilities, if it was AOL. The only part of that that was regulated was the piece that could be severed out. I understand that. I guess my question, though, is that that seems to me to be eminently describable as access to the Internet. It is access to the ISP's facilities. But standing alone, it doesn't have the kind of computer-facing gateway qualities that actually creates the interaction. Other things have to happen. Yes, and you're purchasing that service. You're purchasing from the telephone or cable company or whoever it is that's providing transmission, just pure transmission to get to the ISP. It's the ISP that has those computer processing functions that put that on a different footing. And just a point about the interconnection issue. I think FCC counsel's citation to cable and wireless really shows that we are talking about two different things. The cable and wireless decision, the international settlements case, was one in which the carrier here was paying another carrier to terminate a call to complete the service it was providing the customer. The reason this court in Verizon said that the traffic exchange and interconnection happening at the edge was a separate service was because it was relying on the Supreme Court's Midwest Video 2 decision, which talked about cable companies carrying the programming of programmers, carrying that content to its retail subscribers, and treated that as a separate service that couldn't be subject to common carriage. That's what's going on here. This is the carrying of content by content providers to another set of customers. That's why the court said that was a separate service that couldn't independently be subject to common carriage unless it was reclassified. And, Judge Williams, everything you said about the one-sided nature of the way the costs are being imposed in the paid prioritization issue absolutely applied to interconnection because the interconnection complaints are not going to be filed by retail customers. That's a fiction. This is all about jurisdiction over the disputes that have arisen between the edge providers and the other content providers and the ISPs and the commission. What about the only issue when those arise will be the impact of them on the consumer? That's all. That's the only issue. But the issue will be did we violate common carriage obligations in providing that service to the edge providers. Your Honor, did the edge service provider violate common carriage regulations? I think, Your Honor, that is at that point a convoluted way to get at what we really know they're getting at. And the one other point I would make about this is that even if Your Honors are unsure about interconnection, we haven't talked about notice here, but the starkest notice violation in this segment of the argument was interconnection. Every theory that we've been talking about today was completely absent from the record, from the notice. The chairman said when the notice was first issued, I think interconnection should be addressed in a separate proceeding. It was only in the course of the last few days that the commission came up with the theory that Your Honor just mentioned, which is that the retail customer relationship is somehow grabbing on to the interconnection arrangements and the second is all subsumed within the first. We never commented on that. We never commented on that because we never heard of it. We never heard of it because the commission's intention, once it moved to the last phase of this, was to reclassify the sender side, the edge provider side, and only at the very end when Google came in did that part of the order get switched. And so if nothing else, that part of the order should be vacated because there wasn't anything like the kind of notice that would be necessary before this kind of theory was adopted by the commission in a rule. And if the court has no further questions. Thank you. The court will take a brief recess. Stand, please. Thank you. Thank you. Thank you.
judges: Tatel, Srinivasan, Williams